FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

2015 MAR -4 P 3:21

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| ANGONG ACUIL | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| | ) |
| MIDLAND CREDIT | ) |
| MANAGEMENT, INC. | ) |
| and | ) |
| MIDLAND FUNDING LLC | ) |
| | ) |
| Defendants. | ) |

Civil Action No: 1:15CV293-LO-MSN

## COMPLAINT

Plaintiff Angong Acuil ("Plaintiff"), by and through counsel, brings this Complaint against Defendant Midland Credit Management, Inc. and Defendant Midland Funding LLC on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.     Angong Acuil came to the United States to further her education and begin working for her native country: Sudan. After completing her education and service here, she paid off all her outstanding debts and returned to her portion of Sudan which later became known as South Sudan. From 2007 until 2012 she remained out of the country. During her absence, her credit had been stolen by an individual believed to be living in Reno, Navada. The thief apparently opened new accounts and took over existing accounts running up large debts and allowing them to lapse into default. One of the compromised accounts was a Chase credit card that she had opened originally, paid in full before she left the country, and was later taken over by the identity thief. In June of 2012 Ms. Acuil returned to the United States to work in the Embassy of South Sudan. Shortly after her return, she began receiving calls from debt collectors claiming that she

was obligated on various defaulted accounts. Ms. Acuil took action immediately by contacting the credit bureaus and reporting the theft of her identity to the Alexandria, Virginia police department. Midland is a debt collector with a history of failing to apply the necessary resources to comply with the FCRA to conduct reasonable investigations into such disputes. Plaintiff has sued both Midland Credit Management, Inc. and Midland Funding LLC, because both entities responded to the CRAs about this account in response to ACDVs. While the two Midlands are separate legal entities, it appears as if they respond to credit disputes interchangeably about the very same accounts. Based upon information and belief, Midland Funding LLC purchased the account from Chase and in the sales transaction received no supporting documents, no warranties as to authenticity and no proof as to the individual that opened or used that account. Because creditors sell such accounts to debt collectors for a few pennies on the dollar, the sellers routinely provide no supporting documentation, no warranties and no representations as to the reliability of the account data. Without any documents or assurances from the original creditors, debt collectors like Midland are not in a position to reasonably investigate claims of identity theft, much less verify that the disputing consumer actually owes the debt. Despite such inabilities, Midland continued to verify the accuracy of the Chase debt to the Credit Reporting Agencies ("CRAs"). The CRAs, however, are well aware of the tendencies of debt collectors to recklessly verify accounts and frequently delete the trade lines even if the debt collector decides to verify. In this case, TransUnion deleted the trade line because Midland failed to respond timely to the ACDV exchange. Thereafter, Experian and Equifax both deleted the trade line as well and by law were required to notify Midland that they had done so. Despite the fact that all three major

2

CRAs ultimately deleted the trade line, Midland refused to give up and continued to harass Ms. Acuil and represent that she remained obligated on the fraudulent account. This case demonstrates exactly how recklessly debt collectors like Midland violated the laws that Congress established to protect consumers like Ms. Acuil: the FCRA and FDCPA. Accordingly, Ms. Acuil seeks damages under the FCRA at 15 U.S.C. 1681 *et. seq.* as well as the FDCPA at 15 U.S.C. §1692e including all actual damages, statutory damages, attorney's fees, and costs.

### Parties

2.      Plaintiff Angong Acuil is a natural person, and a "consumer" as defined by the FDCPA at 15 U.S.C. §1692a(3). In addition, the credit card at issue in the Complaint involves a "debt" as defined by 15 U.S.C. §1692a(5). Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Angong Acuil.

3.      Defendant Midland Credit Management, Inc. is a Kansas corporation with its principal place of business in California. The Defendant is a debt collector as defined by 15 U.S.C. §1692a(6) as it is believed that the principal purpose of Defendant's business is to collect debts using the mail and telephone. Based upon information and belief, Midland Credit Management, Inc. is also a person as defined by the FCRA who appears to have responded to two ACDVs issued by Equifax in March 2013.

4.      Defendant Midland Funding LLC is registered to do business in the Commonwealth of Virginia. Based upon information and belief, Defendant Midland Funding LLC is the purported owner of a debt purchased from JP Morgan Chase. In addition, Midland Funding LLC is believed to be a person and furnisher for purposes of the FCRA based upon consumer file disclosures and credit reports issued by the credit

reporting agencies. Additional discovery is necessary as to whether Midland Funding LLC is also a debt collector as defined by the FDCPA.

## Jurisdiction & Venue

5.    This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681(p).  Venue is proper in this jurisdiction because events giving rise to this Complaint occurred in the Alexandria Division of the Eastern District of Virginia and that forum is the forum most convenient for the adjudication of his claims.

## Facts

6.    Ms. Acuil lived in the United States from January 2001 to 2007 and during this time period she went to college and worked in Washington, D.C.  In March of 2007, she went back to Sudan where she remained for a number of years.  Based upon passport information related to her travel, Ms. Acuil left the United States on March 4, 2007.

7.    Before she left the United States, Ms. Acuil made sure that her financial affairs were in order, and she left with no outstanding debt and no derogatory credit references on her credit file.  In June of 2012, Ms. Acuil returned to the United States to work at the Embassy of South Sudan.

8.    A few months after her return to the United States, Ms. Acuil started getting debt collection calls stating that she owed money for past due debts.  Ms. Acuil knew that she should not have had any past due debts because she paid all of her creditors prior to leaving the United States in 2007.

9.    On January 15, 2013, Ms. Acuil applied for credit with CitiBank, and she was turned down for credit because of seriously delinquent obligations that Experian

reported on her credit file. Ms. Acuil was concerned about being denied credit because she needed to reestablish herself in the United States and knew that she should not have had any unpaid bills.

10.    Concerned about the situation, Ms. Acuil tried to obtain copies of her consumer file disclosures from the major credit reporting agencies, but she was only able to obtain copies of her credit file from Experian, which occurred on or about January 29, 2013.

11.    After reviewing the Experian credit file, the contents confirmed her suspicions that she had debts associated with her name that were not her debts. On the file disclosure, she saw six trade lines that she did not recognize. These trade lines were for credit cards and resulting debt collector accounts for debts and charges that she never authorized as she was out of the country. Based upon information and belief, the identity theft related debt totaled more than $25,000. This is a staggering sum of money given that Ms. Acuil was returning to the United States and trying to reestablish herself in this country. Ms. Acuil's credit file should have reported no derogatory credit references and no money owed.

12.    One of the identity theft related accounts involved the debt at issue in this action. Defendant Midland Funding furnished information to Experian indicating that Ms. Acuil owed over $14,000 for a defaulted credit card that Midland Funding, LLC had allegedly purchased from Chase Bank USA, N.A.

13.    Ms. Acuil was extremely upset to see the debts and debt collection companies on her credit reports. As she got more calls and letters from debt collectors, she did not know what to do in order to remedy her problem. After thinking about the

situation, she believed she was the victim of identity theft. On February 27, 2013, Ms. Acuil decided to file a police report related to the identity theft in the City of Alexandria, Virginia as that was the jurisdiction of her current residence.

14.    On February 27, 2013, Ms. Acuil also sent credit dispute letters to the three major credit reporting agencies. In her letters to the credit reporting agencies, she informed them that she had just filed a police report regarding the theft of her identity and informed the credit reporting agencies that she was a true identity fraud victim. Among the disputed accounts was the account with Midland Funding at issue in this action with the last four digits 6791 (hereinafter the "Midland account").

15.    Ms. Acuil did not incur the charges related to the Midland account as the account was originally opened by her and then taken over by the identity thief sometime after she left the country. The Chase account that Midland purchased had a date of first delinquency in January 2009 well after the time period that Ms. Acuil left the country. Based upon information and belief, the identity thief took over the account after Ms. Acuil left the country, ran up the balance, and ultimately allowed the account to lapse into default.

16.    On March 7, 2013, Equifax issued an ACDV to Defendant Midland Credit Management, Inc., with Equifax subscriber code 181FY00167 on the ACDV. In said ACDV, Equifax issued a dispute code 20 representing, "claims true identity fraud." In addition, Equifax alerted Midland as to the potentially fraudulent addresses of 1645 Jackson Pl, Reno Nevada and 14509 Danville Rd Woodbridge, Virginia 22193 as part of the March 7, 2013 ACDV.

17.     Based upon information and belief including information related to another identity theft related account, the identity thief would have used the 1645 Jackson Place address in Reno, Nevada as the contact address for the Chase account that Midland ultimately purchased and is at issue in this action. Having received an ACDV that alerted Midland that the account was identity theft related along with a relevant fraudulent address, Midland had all the information it needed in order to conduct a reasonable investigation into the accuracy of the debt and the account. Any reasonable investigation conducted would have resulted in an instruction to delete the account for fraud since Midland would not have had sufficient information to verify that she was the one responsible for the debt.

18.     On March 8, 2013, Midland Credit Management responded to Equifax's ACDV by instructing a modification to the data that only updated the date of account information and the current address identified for the account.  Midland Credit Management did not delete the account for fraud and continued to report that she was responsible for the account and the past due balance of $14,255.

19.     Additional discovery is necessary as to what if anything Midland Credit Management did to investigate the identity theft related dispute.  Midland Credit Management in the past is believed to have used an automated process for FCRA dispute investigations.  This is problematic as an automated investigation process assures that there is no review of the underlying account paperwork, which likely would have resulted in an instruction to delete the account. Equifax's ACDV does not identify the name of any individual that conducted the investigation and simply identifies "Midland Credit

Management" as the identification of the responder. Typically on an ACDV, the natural person's name who processed the dispute is identified as the responder on the ACDV.

20.     In addition, the relationship between Midland Funding, LLC and Midland Credit Management, Inc. must be explored in discovery as Ms. Acuil's consumer file disclosures identify Midland Funding, LLC as the furnisher of the information whereas the Equifax ACDV identified the responder to the ACDV as Midland Credit Management. Midland Credit Management, Inc. and Midland Funding, LLC are two different corporate entities and therefore the documents in possession of one entity for FCRA investigations maybe different than the documents in possession of the other entity. In any event, Plaintiff has named both entities as Defendants because it is unclear which entity or if both entities are responsible for the FCRA violations.

21.     Further factual context to the complexity of the relationship between Midland Funding LLC and Midland Credit Management, Inc. is demonstrated by a review of documents obtained from TransUnion. On March 8, 2013, after receiving Ms. Acuil's credit dispute letter, TransUnion purportedly issued an ACDV to Midland Funding LLC indicating the account was a true identity fraud. Midland Funding LLC never responded to the TransUnion ACDV within the allotted time period which resulted in TransUnion deleting the Midland account from its credit records. Given that Midland Credit Management appears to have an automated process that allowed the debt to remain on Ms. Acuil's Equifax file and Midland Funding LLC failed to even respond to TransUnion's ACDV, this further evidences that neither company follows any reasonable process for the investigation of identity theft related disputes.

22.     Based upon information received from Equifax, Experian issued an ACDV to Midland Credit Management on March 12, 2013 in which it also stated that the account was true identity fraud.  On March 13, 2013, Midland Credit Management responded by modifying information to update the date of account information and to increase the past due balance to $14,277.  Fortunately for Ms. Acuil, Experian would delete the Midland account from her Experian credit file on April 2, 2013.

23.     Pursuant to the requirements of the FCRA at 15 U.S.C. §1681i(a)(5)(A)(ii), Experian would have notified Midland Credit Management that it deleted their account from Ms. Acuil's credit report.  This placed Midland Credit Management on notice that Experian considered the account and debt so unreliable that Experian would not continue to report the information on Ms. Acuil's credit report. Given the identity theft allegations and the fact that Experian would have deleted the account despite the ACDV response from Midland Credit Management, a reasonable furnisher would know or should have known that a third party had determined that Midland Credit Management should not represent that Ms. Acuil was indebted to it in any amount.  In fact, a similarly situated debt buyer/debt collector, Portfolio Recovery Associates, deleted an account from Ms. Acuil's credit files after it received notice of Ms. Acuil's identity theft.

24.     On April 8, 2013, Equifax provided Midland Credit Management another opportunity to delete the account from Equifax's credit files.   Because Experian and TransUnion had already deleted the account, Ms. Acuil needed Midland to delete the account from her Equifax files, so the debt would no longer haunt her.  Equifax's ACDV once again informed Midland Credit Management that the account was a true identity

theft related account. As with the previous Equifax ACDV, Midland Credit Management responded with no natural person identified on the ACDV response by updating the past due balance to a higher amount and updating the date of account information. Given that Experian had deleted the account and would have notified Midland Credit Management of the same and that Midland Funding did not even bother to respond to TransUnion after receiving an ACDV, Midland Credit Management's investigation process was in reckless disregard for investigating an identity theft allegation as an automated response with no investigation into the underlying documents is inherently reckless.

25.     Based upon the practice in the industry among debt buyers, Midland Funding, LLC would not have received any original documentation including charge slips showing that Ms. Acuil was obligated to pay the balance on the Chase account. It is common in the debt purchase industry that debts are sold pursuant to a purchase agreement called a "forward flow agreement" between the seller and buyer. Typically in these forward flow agreements, no representations are made regarding ownership or authenticity for any particular debt and no warranties or supporting documentation are provided by the seller to the buyer, which means said buyer knows that the purchased debt may be identity theft related with no proper supporting documentation proving the debt collectable.

26.     Standard practices in the debt buying industry are to purchase the debt and then begin skip tracing and collection efforts on the alleged debts. These actions can be in contravention of Federal Trade Commission authority that states that a debt buyer must have some underlying supporting documentation that the debt buyer actually owns an account prior to representing on a consumer's credit report that an obligation is owed by

10

verifying the debt in response to an ACDV. *See* 2000 FTC Consent Decree in the matter of *U.S. v. Performance Capital Management*, available on the internet for review at http://www.ftc.gov/os/2000/08/performconsent.htm (stating in part, "[W]hen a consumer disputes the accuracy of information reported by the defendant to a consumer reporting agency, defendant shall either verify the information with the original account records within the time period set forth in Fair Credit Reporting Act or take all necessary steps to delete the information from the files of all consumer reporting agencies to which the information was reported. In any situation where the defendant either knows that no original records exist, or is informed by the original creditor that no records exist, the defendant shall, within five business days after receiving the consumer dispute, notify all consumer reporting agencies to which the information has been provided that the information is to be deleted from the file of the consumer who has disputed the account."

27.     Given that Midland Funding LLC is the purported owner of the debt and that Midland Funding LLC did not bother to respond to the TransUnion ACDV, Midland Credit Management's automated dispute investigation procedure and response to Equifax shocks reason as Midland Credit Management appears to be responding to ACDVs that it may not even have access to the underlying account information and Midland Funding LLC decided not to respond to an ACDV perhaps demonstrating that it did not have the actual documents proving indebtedness.

28.     Ms. Acuil needed to access and utilize her credit because she was trying to reestablish herself in the United States. She wanted a credit card and to purchase an automobile. Accordingly, she applied for credit in April 2013 to see if she could be approved because she had a good credit history prior to the theft of her identity

29.     On April 15, 2013 as part of her attempt to purchase a car, Alexandria Toyota obtained a copy of her Equifax credit report that contained the Midland account stating that she was over $14,000 past due to Midland.  As a result, Ms. Acuil was unable to purchase a car.  Additional discovery is necessary as to instances in which other potential creditors viewed credit reports containing the Midland account, and Ms. Acuil suspects that the Midland account appeared on credit reports to Capital One Bank on April 12, 2013 and April 15, 2013.

30.     On April 16, 2013, Ms. Acuil sent a second credit dispute package to the credit reporting agencies.  Once again, Ms. Acuil explained the circumstances related to the theft of her identity and provided additional information in support of her letter. Among the documents included with her letter were: a copy of the police report from the City of Alexandria that she identified in her first letter, two utility bills, a copy of her lease, and a copy of her relevant passport information demonstrating that she was out of the country during the relevant time period.

31.     As a result of this second credit dispute package, Equifax elected to delete the account from Ms. Acuil's credit report due to fraud allegations and a police report. Pursuant to 15 U.S.C. §1681i(a)(5)(A)(ii), Equifax would have notified Midland Credit Management that it deleted their account from Ms. Acuil's credit report just as Experian notified them.  This placed Midland Credit Management on notice on two occasions that two separate credit reporting agencies considered the account and debt so unreliable that both Equifax and Experian would not continue to report the information on Ms. Acuil's credit report.  Midland knew from the ACDVs that this was a true identity theft scenario and knew that the credit reporting agencies deleted the account for fraud.

32.    Undeterred by these notices, Midland Credit Management, Inc. continued to undertake debt collection activities on debt that Ms. Acuil did not owe, two different credit reporting agencies notified Midland Credit Management, Inc. would be deleted from the credit file, and a debt that Midland Funding LLC did not even bother to respond to the ACDV that it received from TransUnion. Midland Credit Management continued to send collection letters to Ms. Acuil misrepresenting the amount of the debt and that she was obligated to pay for the identity theft related debt. Based upon information and belief, Midland continues to represent that Ms. Acuil is indebted to them.

## COUNT I
### Fair Credit Reporting Act
### 15 U.S.C. 1681 s-2(b)

33.    Plaintiff incorporates paragraphs one (1) through thirty-two (32) as if fully stated herein.

34.    Midland Credit Management, Inc. both negligently and intentionally violated the Fair Credit Reporting Act at 15 U.S.C. 1681s-2b (b) by failing to conduct reasonable investigations with respect to the disputes that it received from Equifax and Experian as detailed in the factual averments of this lawsuit.

35.    As described in the factual averments, Midland Credit Management, Inc. received three different ACDVs from credit reporting agencies in accordance with their duties to notify Midland Credit Management, Inc. of Mrs. Acuil's credit reporting disputes.

36.    Instead of conducting a thorough and searching inquiry into Ms. Acuil's claims of identity theft, Midland Credit Management, Inc. and/or Midland Funding LLC engaged in superficial, improper and reckless FCRA investigations that failed to instruct

the credit reporting agencies to delete the accounts from the Plaintiff's credit files. The negligence and/or reckless of the FCRA investigations are demonstrated by the following facts: (a) Midland did not timely respond to the TransUnion ACDV; (b) Midland did not have access to verifiable account records from the original creditor (Chase) to prove Ms. Acuil's indebtedness even if it had conducted a thorough and searching inquiry; (c) Midland ignored instructions from the credit reporting agency that Ms. Acuil was an identity theft victim; (d) Midland disregarded the notices from Experian and Equifax that they considered the debt so unverifiable as to require deletion; and (e) based upon information and belief, Midland did not even request an individual employee to investigate the claims of identity theft and instead relied upon an automated process that simply verified this unverifiable debt.

37.    Extensive punitive damages are warranted by the facts of this matter because Midland Credit Management, Inc. and/or Midland Funding, LLC has ignored the clear instruction of the Fourth Circuit Court of Appeals that a reasonable furnisher investigation under the FCRA requires a systemic inquiry and not just a cursory examination of computer records as occurred in all of the "investigations" in this case. *See Johnson v. MBNA, Inc.* 357 F.3d 426, 430-431 (4th Cir. 2004) *stating* "Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute - and, ultimately, correct - inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, *unreasonable*

inquiries by creditors." Punitive damages are necessary to change this behavior and protect future consumers from the harm of poor investigations of credit disputes. In all likelihood, Midland implements this policy to keep the cost of credit dispute investigation low with no regard to great harm that it causes consumers.

38.     Plaintiff is entitled to actual damages, statutory damages, and punitive damages based upon the violations of the Fair Credit Reporting Act. Plaintiff suffered damages in the form of the loss of time from work to correct the reporting of the inaccurate accounts, inability to obtain a car purchase, and frustration and aggravation of dealing with problems related to the Midland account including receiving improper collection contacts for a debt that she did not owe as well as all attorney's fees and costs.

## COUNT II
## Violation of the Fair Debt Collection Practices Act

39.     Plaintiff incorporates paragraphs one (1) to thirty-eight (38) as if fully stated herein.

40.     Defendant Midland Capital Management, Inc. violated the FDCPA at 15 U.S.C. §1692e because a debt collector may not use any false or deceptive representations in connections with the collection of a debt. Defendant falsely and deceptively continued to state that Ms. Acuil owed the debt when the account was related to identity theft and she did not have any obligation for charges on an account that were made while she was out of the country.

41.     After Ms. Acuil disputed the Midland debt with the credit reporting agencies all three credit reporting agencies ultimately deleted the account from her credit report. Based upon documentation from Equifax, it deleted the account because Ms. Acuil provided it with a copy of her police report.

42.     The FCRA as written requires consumers who are the victim of identity theft to provide information directly to the credit reporting agencies, who in turn notify the furnishers of the information of events related to the identity theft.

43.     Pursuant to two separate provisions of the FCRA, 15 U.S.C.§1681 c-2(b) and 15 U.S.C. §1681i(a)(5)(A)(ii), Midland Credit Management would have received notice that the debt was unverifiable and uncollectible because of identity theft.

44.     Rather than ceasing all collection activity as another debt collector did, Midland Credit Management, Inc. continued to send letters to the Plaintiff in an effort to collect a debt that was not valid in a deceptive and misleading effort to make Ms. Acuil feel obligated to make payment.

45.     Plaintiff requests actual damages awarded by a jury for her frustration, anger, and upset, as a result of receiving collection notices that she should have never had received because all of the credit reporting agencies had previously deleted the accounts from her credit file and where Experian and Equifax would have informed Midland that it deleted the account after their investigation.  Plaintiff also requests $1,000 in statutory damages, attorney's fees, and costs as permitted under 15 U.S.C. §1692k.

### Prayer for Relief

Wherefore, the plaintiff prays that the Court award the following relief:

a)      compensatory damages against Midland;

b)      punitive damages based upon Midland's reckless violations of the FCRA;

c)      statutory damages against Midland based upon multiple violations of the FCRA;

d)      statutory damages based upon Midland's violation of the FDCPA

e)      interest, pre-judgment interest, costs and reasonable attorneys' fees

incurred by the Plaintiff;

f)      all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted
ANGONG ACUIL

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
11790 Sunrise Valley Dr., Suite 103
Reston, Virginia 20191
(571) 313-0412
(571) 313-0582